IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, )
)
    Plaintiff, )
)
vs. ) Cr. No. 01-1224JC
)
HUGO ANTONIO ROMERO-GARIBAY, )
)
    Defendant. )

## MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION TO DISMISS INDICTMENT

THIS MATTER CAME ON for a hearing, pursuant to the defendant, Hugo A. Romero-Garibay's, motion to dismiss the indictment, dated February 20, 2002. The United States filed its response in opposition to defendant's motion on March 5, 2002. A hearing on defendant's motion was held in Las Cruces, New Mexico, on March 20, 2002. At that hearing, the Court heard the arguments of counsel, which focused on the transcript of defendant's August 22, 1991 Deportation Hearing before the Immigration and Naturalization Service (INS), which was attached to defendant's motion and which has been made a part of the record in this case.

Now, based upon the record and the briefs and arguments submitted by counsel, and being otherwise advised in the premises, it is hereby:

**ORDERED** that defendant's motion to dismiss the indictment is **DENIED**.

39.

# **FACTUAL FINDINGS**

1. On June 17, 2001, defendant was arrested and charged with illegal reentry into the United States after deportation subsequent to conviction for an aggravated felony. On or about September 19, 2001, the Grand Jury returned a one-count indictment charging defendant with the foregoing offense, in violation of 8 U.S.C. § 1326(a)(1), (2), and 8 U.S.C. § 1326(b)(2).

2. Defendant is (and, at all times, has been) a citizen of the Republic of Mexico.

3. Defendant was born in Mexico on September 12, 1967. He first received permission to enter the United States *legally* when he was less than three years old, *i.e.*, on or about August 11, 1970.

4. On or about October 2, 1990 (*i.e.*, more than twenty years after he legally entered the United States), defendant was convicted, after a jury trial, in New Mexico state court for Battery on a Police Officer, an Aggravated Felony within the meaning of 8 U.S.C. § 1101(a)(43).

5. On August 22, 1991, after defendant had served his term of imprisonment for the aggravated felony described *supra* at ¶4, INS held a Deportation Hearing in El Paso, Texas and, at the conclusion of the Hearing, INS ordered defendant deported to the Republic of Mexico.

6. (a) At defendant's August 22, 1991 Deportation Hearing, the presiding INS Immigration Judge (IJ) began by addressing the entire group of aliens (including the defendant) who had been previously been given notice to show cause why they should not be deported or removed from the United States. In reviewing the transcript, it appears that, in addressing the entire group, the IJ assured the presence of a Spanish translator for all who needed one,[1] advised

---

[1] Defendant evidently did not require one, for he was among the few aliens who expressed a preference to have his proceedings conducted in English.

that deportation would have the effect of "cut[ting] off any residence rights you may heretofore have had here in the United States," advised that deportation would preclude reentry for "at least" five years, advised that any subsequent reentry made without the Attorney General's permission would subject each deportee to yet another prison term, and confirmed that all deportees understood the possible effect of deportation. *See* INS Tr. at 1-5.

(b) The IJ also told the entire group that each alien was entitled to be represented by an attorney and advised them of a list of organizations that provided free (or, nominal) legal services. *See* INS Tr. at 5-6. After the IJ asked whether anyone wanted "plenty of time" to get an attorney, *see* INS Tr. at 5-6, he found that, while two of the aliens did want an attorney, defendant Romero-Garibay did not want one. *See* INS Tr. at 6-7. The IJ then told the group that each alien had the right to challenge the Government's evidence and to present its own, *see* INS Tr. at 8-9, and that if anyone wanted to appeal the IJ's decision in an individual case, then any alien could take an appeal – even if the alien had no money. *See* INS Tr. at 9.

7. (a) The IJ then examined each alien individually. When questioning defendant Romero-Garibay, *see* INS Tr. at 11-16, the IJ confirmed the defendant's identity, determined that the defendant spoke English, confirmed that the defendant had entered the United States from the Republic of Mexico in 1970, and confirmed that the defendant had been convicted of (a) Battery on a Police Officer in 1990, and (b) Burglary of a Vehicle in 1986.

(b) The IJ then told the defendant that "since you've been a permanent resident since August 11, 1970, you have a good deal more than seven years as a lawful permanent resident." INS Tr. at 12. The IJ told defendant about:

3

> the availability of making application to this court for a waiver of
> your charge of deportability under Section 212(c) of the
> Immigration Nationality Act, which, if that waiver is granted by this
> court, even myself or some other judge, then you can basically have
> the charges against you wiped out and you can continue to remain
> and live here as a lawful permanent resident.

*Id.* at 12-13. The IJ cautioned that such waivers "aren't easy to come by," *id.* at 13, but nevertheless urged: "[I]f you wish to make application, we will certainly make efforts to entertain that as favorably as possible." *Id.* at 13.

    (c)    Defendant advised that he did not want to apply for a waiver. *See* INS Tr. at 13. The IJ told defendant that once he was deported, "the chances of you ever legally immigrating to the United States are almost none" and that deportation would "cut[] off your permanent residence for all times [sic]." *Id.* at 14. After the IJ again asked defendant if he wanted to apply for a waiver, defendant asked: "How long will I have to remain here to get that[?]" *Id.* In response, the IJ estimated that "[w]e would probably get it done sometime within four weeks, probably close to two weeks" *Id.* at 15. The IJ then stated:

> [I]f I were in your shoes, it would be worth it to go ahead and ask
> [for the waiver], because this is the last chance you're going to have
> to stay in the United States. If you just accept the order of
> deportation, that's it. You're going to be down in Mexico the rest
> of your life.

*Id.* at 15.

    (d)    In response, defendant, again, did not to apply for a waiver. Instead, he asked: "Can I get pardoned?" *Id.* at 15. The IJ replied that he did not "know of any pardon that's going to be available to you," but that, "if you refuse the waiver at this time, and go down to Mexico, you should anticipate going down there to stay." *Id.* The IJ added:

4

> And the reason I'm being extra cautious about this is that you've basically been raised in this country and you're a very young man. I don't know how you're going to adjust to being down in Mexico .... But I want to make sure that if you do decide to make a waiver of making application through this waiver, that you'll understand the ramifications.

*Id.* at 15-16. Defendant nevertheless stated that he wished to "assume [his] deportation," and that he waived his appeal. *Id.* at 16. Accordingly, the IJ ordered him deported.

## **LEGAL CONCLUSIONS**

8. In general, aliens who challenge prior deportations must adduce evidence sufficient to reverse the "presumption of regularity" that attaches to such proceedings. *United States v. Arevalo-Torres*, 210 F.3d 1198, 1200 (10th Cir. 2000) (defendant cannot establish "fundamental unfairness" merely because deportation tape cannot be located; "even when a deportation tape is unavailable, the burden of proof in a collateral attack on a deportation order is on a *defendant*, based on the *presumption of regularity* that attaches to a final deportation order") (emphasis added) (citing *United States v. Solano-Ramos*, No. 99-1252, 2000 WL 159952 (10th Cir. Feb 15, 2000) at *3).

9. More specifically, the principles governing the defendant's motion are set forth in *United States v. Meraz-Valeta*, 26 F.3d 992 (10th Cir. 1994). In that case, the defendant was prosecuted for illegal reentry and, as in the present case, the *Meraz* defendant argued that his prior deportation was Constitutionally defective and thus could not support his present prosecution. Specifically, the defendant in *Meraz* argued that the Immigration Judge had allegedly "fail[ed] to inform him of his right to appeal." *Meraz-Valeta*, 26 F.3d at 998.

Relying upon the Supreme Court's decision in *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987), however, the *Meraz-Valeta* Court stated: (1) that to bring a successful collateral attack on a deportation order, the alien defendant must "establish fundamental unfairness;" and (2) that to establish "fundamental unfairness," the alien must show that he was "prejudiced." *Meraz-Valeta*, 26 F.3d at 998. Because the *Meraz-Valeta* defendant contended that the IJ's failure to advise him of his right to appeal constituted "fundamental unfairness," the Tenth Circuit stated that, to then establish the requisite "prejudice," the defendant must "show that if he had been appropriately informed of his right to appeal, the *outcome* of his case would have been *different.*" *Id.* at 998 (emphasis added) (citing *United States v. Holland*, 876 F.2d 1533, 1537 (11th Cir. 1989)). Because defendant could not make this latter showing, the Tenth Circuit rejected his argument. *Meraz-Valeta*, 26 F.3d at 998.

10. In the present case, defendant cannot establish that his August 22, 1991 deportation hearing was "fundamentally unfair," thereby making it unnecessary to proceed to the "prejudice" part in the *Meraz-Valeta* inquiry. As shown above, the IJ specifically advised defendant of his free legal services, his right to an interpreter, his right to counsel, his right to a postponement, his right to present evidence, his right to challenge the Government's evidence, and his right to appeal. *See supra* at ¶¶6, 7. The IJ also confirmed the defendant's identity, the essential elements of the predicate offense, and defendant's immigration status. *See id.* The Court is impressed by the lengths to which the present defendant's Immigration Judge went to alert defendant to the fact that his deportation would be attended by potentially dire immigration consequences. *See supra* at ¶ (7)(c) ("[I]f I were in your shoes, it would be worth it to go ahead and ask [for the waiver], because this is the last chance you're going to have to stay in the United States. If you just accept

the order of deportation, that's it. You're going to be down in Mexico the rest of your life.") (transcript cite omitted).

11. Defendant's 1991 deportation order carries a strong presumption of regularity – indeed, that order stood, unchallenged, for nearly a decade. *See Arevalo-Torres*, 210 F.3d at 1200 (discussing defendant's burden to rebut presumption). Viewing the entire record in this case in light of that presumption, this Court concludes that the defendant has failed to establish that his August 22, 1991 deportation hearing was "fundamentally unfair." Accordingly, this Court ***DENIES*** his motion.

***IT IS SO ORDERED*** this _____ day of April, 2002.

_____
UNITED STATES DISTRICT JUDGE